[Civ. No. 69794. Second Dist., Div. Two. Oct. 24, 1984.]

DONALD V. COCKBURN, Plaintiff and Respondent, v.
SANTA MONICA COMMUNITY COLLEGE DISTRICT
PERSONNEL COMMISSION, Defendant and Appellant;
SANTA MONICA COMMUNITY COLLEGE DISTRICT,
Real Party in Interest and Appellant.

**COUNSEL**

Jones & Matson and Urrea C. Jones, Jr., for Defendant and Appellant and for Real Party in Interest and Appellant.

Grubbs & Collins and V. James Smith for Plaintiff and Respondent.

**OPINION**

**ROTH, P. J.**—The Santa Monica Community College District Personnel Commission (Commission) and Santa Monica Community College District (College) appeal from the judgment of the superior court granted in favor of Donald Cockburn (respondent) pursuant to his petition for writ of mandate to set aside the decision of the Commission rendered on December 22,

1981, which terminated his employment with College as an instructor and ordered his dismissal.

The superior court judgment rendered on December 25, 1983, set aside and vacated the Commission's decision and ordered the Commission to reinstate respondent, redetermine the penalty of dismissal, and impose a penalty not inconsistent with its opinion. Paragraph two thereof recites in pertinent part: "2. As a condition of reemployment, Petitioner shall continue with regularly scheduled psychological consultations until such time as Dr. Marshall Levy or other competent psychologist renders a written report to Real Party in Interest's Administrative Dean of Personnel Services that Petitioner has been rehabilitated."

Respondent had been employed by College as a laboratory technician and instructor in the physical sciences department for approximately 17 years. His job included hiring and supervising student laboratory assistants.

Duria Suncar, an 18 year old Oriental student at the college, asked respondent about employment as a lab assistant. On February 6, 1981, she was interviewed by respondent. A complaint filed with College on February 20, 1981, by Duria alleges the following occurred on February 6: "Complainant, Doria Suncar, was sent to be interviewed for work in the chemistry lab by Dell Wade in Financial Aids. [Respondent] met her and put her to work immediately washing beakers. He then asked her to come with him to the basement to do some work. In the basement he held her hand, asking how her hands felt washing all those dishes. He then grabbed her, holding her tightly. He kissed her on the cheek then on the mouth, saying afterwards, 'o.k., go to work.' Five or ten minutes later he tried to embrace her again. Complainant said 'no, I don't want to.' In about five minutes she told him she was leaving. She did not return. Two weeks later she returned to Financial Aids and asked for another job. She said she had not come back sooner because she was confused, and then told Ms [*sic*] Wade what had happened in the Chemistry lab."

The sexual assault outlined above was admitted by respondent and is fortified by abundant uncontradicted evidence. It was the sole basis of the Commission's decision. The judgment of the superior court vacated it for the reason that respondent prior to his hearing had not received a notice as required by Education Code section 87031[1] and *Miller* v. *Chico Unified School Dist.* (1979) 24 Cal.3d 703 [157 Cal.Rptr. 72, 597 P.2d 475].

---

[1]Education Code section 87031 states in part: "Materials in personnel files of employees which may serve as a basis for affecting the status of their employment are to be made available for inspection of the person involved. . . . Information of a derogatory nature . . . shall not be entered or filed unless and until the employee is given notice and an opportunity to review and comment thereon. An employee shall have the right to enter, and have attached to any such derogatory statement, his own comments thereon."

■ The California Supreme Court has construed Education Code section 87031 to require that "Unless the school district notifies the employee of such derogatory material within a reasonable time of ascertaining the material, so that the employee may gather pertinent information in his defense, the district may not fairly rely on the material in reaching any decision affecting the employee's employment status." (*Miller* v. *Chico Unified School Dist., supra,* 24 Cal.3d 703, 713.)[2]

■ Our perusal of the record convinces us that appellants complied in all respects with the Education Code and *Miller.* Respondent had notice within reasonable and ample time as required of any and all prior misconduct and/or derogatory statements available to appellants and did actually avail himself of its use.

We proceed to detail the sequence of the events prior to the hearing before the Commission.

On February 24, 1981, Dean Gelvin met with respondent and Richard Masada, chairman of the College's physical science department, to discuss the complaint. Respondent was advised that "this type of alleged conduct" was unprofessional, the authority in supervisory relationship was not to be abused, and told that his future job performance would be monitored. The substance of a second meeting between the three held on March 5 was memorialized in a document dated March 6 and is identified as "Permanent Employee—Unsatisfactory Job Performance—Second Notice." This notice, among other things, indicated that "[Respondent] has failed to comply with the Merit System Rule [5.1300.3.] All fellow employees must receive courteous treatment." The notice also stated: "The additional improvement required [of respondent]: Student employees must be treated with respect. It is expected that all students employed in the physical science department will receive the same treatment. No behavior with sexual overtones will be permitted in the laboratory or basement stockroom areas." The notice went on to state: "Mr. Masada and Mrs. Gelvin will be available to discuss with respondent any situations that arise at any time. If there are difficulties which we cannot resolve or consider beyond our abilities, we shall assist [respondent] in finding appropriate counseling to deal with this problem.

"Additional improvement in job performance must be made in the immediate future. You will be reevaluated on May 5, 1981. If satisfactory

---

[2]In *Miller,* the court actually discusses and interprets Education Code sections 44031 and 44664 which for all pragmatic purposes applies to this case to Education Code section 87031 and we so treat it.

improvement has not been made you may be subject to future disciplinary action.''

The reference in the ''second notice'' to section 5.1300.3 lists dismissal as a penalty for its violation.

On April 2 a meeting was held between Chairman Masada, Dean Gelvin, Dr. Richard Moore, president of the College, Dean Benita Haley, administrative dean of personnel services and Ms. Vance. At this meeting Ms. Vance told the group that ''similar'' complaints had been lodged against respondent.

On April 3, Dean Haley and Dr. Moore met once more with respondent. The pertinent issues discussed at this meeting were memorialized in a letter dated April 6 signed by respondent and the administrative dean as follows:

''Dear [Respondent]:

''I requested a meeting with you on April 3, 1981, as a result of a thorough review of your 'Unsatisfactory Job Performance—Second Notice' signed on March 6, 1971. Dr. Richard Moore, superintendent and president attended our meeting.

''The purpose of the meeting was to discuss with you the topic of the unsatisfactory notice which was a complaint filed on February 20, 1981, by Duria Suncar, a student helper, describing sexual harassment.

''You were reminded that you have been made aware of 'over-familiarity with female student helpers' in a 'Notice of Need for Work Improvement' on October 20, 1977, and that this continued willful failure of good conduct tending to injure public service was a sufficient single cause for recommending your dismissal to the Board of Trustees. (Merit System Rule 5.1300.3-A) During the discussion that Dr. Moore and I had with you, you admitted that the complaint was an accurate account of what had occurred between Duria Suncar and yourself on Feb. 6, 1981 regretted the incident had ever occurred, stated no such actions with students had ever been taken by you before, and said nothing like that would occur again.

''It is our decision that a recommendation will be made for your dismissal. However, Dr. Moore advised you that the recommendation to dismiss would be delayed for a two month period. During the next two months you are to have eight one-hour meetings with the college psychologist, Dr. Lynne Boylan. The week of June 8 you are to make an appointment with

Dr. Moore and me at which time a decision will be made regarding a recommendation for dismissal."

Dr. Boylan on April 8, by letter, advised Dean Haley that to avoid any conflict of interest charges it would be wise to substitute a psychologist independent of the college. She recommended Dr. Marshall Levy.

In response to Dean Haley's request for an evaluation of respondent, on April 29 Dr. Levy said he would accept the employment if appellant would "communicate his current situation to his wife."

Respondent, after calling on Dr. Levy, decided he would not submit to evaluation on *that* condition. On May 4, 1981, he informed Dean Haley that he would retire and on that day submitted his request for retirement to the board of trustees of College. The board accepted respondent's offer to retire and on the same day notified Dean Haley. Dean Haley advised respondent of the board's action by letter dated May 9, 1981. However, on May 6, 1981, two days after Dean Haley had delivered respondent's retirement request to the board of trustees and after it had been accepted by the board, Dean Haley advised Dr. Levy that College desired to retain his services for 12 therapy sessions with respondent. Respondent agreed to ask his wife to participate in the sessions as required.

On June 15, 1981, respondent, by hand written letter to Dr. Moore advised that it was the opinion of Dr. Levy ". . . I am qualified to continue working in my job. He stated . . . he knows . . . I would never again commit such an act . . . ." Respondent then withdrew his request for retirement. On July 27, 1981, Dr. Levy reported his study by letter addressed to James L. Grubbs who had been retained by respondent as counsel.

On August 4, the board of trustees of College rejected respondent's withdrawal of his request to retire and dismissed him.

There is a distinction we think in a proceeding before the board which was initiated by respondent with a written request for retirement followed by a request to the board to withdraw such request after its acceptance and a proceeding initiated by the board wherein the board makes charges and holds a hearing to enable respondent to reply to the same. The parties however, treated the board's denial of the retirement request as the board's decision to dismiss respondent on the charge of misconduct of which respondent had been given written notice. Respondent appealed to the Commission on that theory and appellants accepted it.

Appearing before the Commission respondent charged that the punishment imposed by board was excessive and board had relied not on the Suncar incident, the single charge against respondent, but also on documents or complaints with which he should have been but was not confronted as required by Education Code section 87031.

On December 11, 1981, the Commission found as follows: "1. That on August 4, 1981, at a regular meeting, The Board of Trustees of the Santa Monica Community College District took action to dismiss the [respondent] for cause as stated in Personnel Commission Rule 5.1300.3-A 'willful failure of good conduct tending to injure the public service,' alleging that [respondent's] conduct toward Ms. Duria Suncar on February 6, 1981, was discourteous and inappropriate.

"2. That prior to this meeting the [respondent] was notified of the charges and at this meeting the [respondent] was given the opportunity to respond before action was taken by the Board.

"3. That the [respondent] has stated by declaration that on February 6, 1981, he approached Ms. Duria Suncar, a student worker in his charge, and grabbed and held her tightly and kissed her on the cheek and attempted physical contact a second time which she objected to and rejected.

"4. That in his position as Laboratory Technician, Physical Science, [respondent] was responsible for the supervision of several student assistants, placing him in a position of responsibility and trust.

"5. That the procedure for dismissal prescribed in Rule 5.1300.50 was properly carried out by the Board.

"6. That the procedure prescribed in Education Code 87031 and rule 7.300, which provides for the notification of the [respondent] by the Administration whenever information of a derogatory nature is placed in District personnel records, was not properly followed by the Board in several instances." The Commission then rendered the following decision: "Pursuant to the foregoing Findings of Fact, the Personnel Commission makes the following decision:

"1. That [respondent] breached his trust and responsibility for the supervision of students.

"2. That [respondent's] conduct toward Ms. Suncar on "February 6, 1981, constitutes failure of good conduct and is sufficient cause for dismissal.

"3. That the action of dismissal by the Board be sustained.

"4. That all materials maintained by the District which do not bear the signature of the originator and which were not presented to the [respondent] prior to entry in the District files be purged and destroyed."

On February 13, 1983, respondent filed a petition for a writ of mandate in superior court. After a hearing, judgment was entered as recited in the opening paragraph hereof. This appeal followed.

We have assumed that section 87031 as construed by *Miller, supra*, 24 Cal.3d 703, means that respondent had the right to know within a reasonable time any of the derogatory evidence, oral or written, that would be used against him at the hearing before the board or Commission. The question was first raised by respondent before the Commission by way of Education Code section 87031. Respondent appeared before the Board on August 4, 1981, and before the Commission in late November 1981.

The specific allegedly omitted derogatory complaints identified by respondent consist of: 1. A letter from Ms. Vance to Dick Wohlgemuth, the then physical sciences department chairman, dated June 29, 1978. In this letter Ms. Vance states: "We have, to date, received four complaints against [respondent] . . . The complainants have all stated that [respondent] has made lewd remarks about and to women and has on occasion put his hands on them in a suggestive manner."

2. An unsigned complaint by Claudia Thoreson, received by Ms. Vance on June 12, 1978.

3. An unsigned complaint by David Moore, received by Ms. Vance on June 12, 1978.

The exhibits[3] before the Commission demonstrate respondent was fully informed not only of all the conversations between members of the faculty

---

[3]Additional references from the exhibits supporting the conclusion that respondent had notice of the derogatory materials are:
July 10, 1981, letter from Dean Haley to respondent.
October 20, 1977, "Notice—Need for Work Improvement."
April 6, 1981, letter from Dean Haley to respondent.
July 27, 1981, report of Dr. Levy.
July 13, 1978, letter from Dick Wohlgemuth to respondent.
April 26, 1981, report from Dr. Boylan to Dean Haley.
June 29, 1978, letter from respondent to "Dick," and the hearing transcript, pages 24, 57, 61 and Wohlgemuth's testimony generally, pages 64, 114, 172-173.

heretofore set forth at which he was present, but also of the substance of such conversations at which he was not present and at which complaints against him had been discussed, all of which took place during the investigation made by faculty members after a specific complaint was filed on February 20, 1981, by Duria. Respondent was immediately alerted and told under the euphemism of evaluation of his work and/or for work improvement as an instructor he was being evaluated by reason of the Suncar incident on a psychological basis and actually advised to seek psychiatric treatment. However, when his peers decided after much discussion that a specific complaint must be filed, a complaint was filed charging him with ". . . wilful failure of good conduct leading to injure the public service . . . [and] recommendation for dismissal . . ." he was and had been specifically advised of the reasons therefor.

The exhibits show a complete knowledge by respondent of the Wohlgemuth (1978) incident. They contain letters from students hired by respondent complimenting respondent as an instructor employed during those prior years hopefully as rebuttal to the prior complaint with which he was confronted. It is worth noting too, that the exhibits demonstrate how respondent, weeks before any counsel appeared on his behalf, was kept meticulously informed by appellants of all of his rights in writing before he delivered his request for retirement to the Board and after it had been accepted by the Board.

Finally, the exhibits embrace the complete written report of Dr. Levy dated July 27, 1981, addressed to respondent's counsel which states in one of its opening paragraphs his knowledge of the effort of College to properly evaluate the Suncar incident and its significance with respect to continued employment by College. Thus if further proof were required of respondent's knowledge of prior complaints of ". . . over familiarity with female student helpers . . ." the doctor's letter supplies it.

"The patient understands your referral as being for the purpose of evaluating his emotional status and further acknowledges that *he was aware that the findings and recommendations would be communicated to his employer and might thus further jeopardize his employment status.* Though a great deal of information was obtained in the course of the evaluation, I am limiting this report to those issues relating to and thus seen as pertinent to his continued employment. I urge this material be treated with the maximum of discretion and confidentiality. [Italics added.]

"PRESENT SITUATION

"The patient is charged under the public service merit system with violation of rule 5.1300.3A. Specifically, the patient is charged with sexual harassment growing out of an incident on February 6, 1981, and a subsequent complaint lodged by the student on February 20, 1981.

"The official complaint by the student indicates that after having been put to work on her initial day of employment, washing beakers in the chemistry lab, the patient held the student's hand, asking how her hands felt, and then holding her tightly, kissed her on the cheek, then on the mouth, saying afterwards, 'Okay, go to work.'

"Five or ten minutes later, he attempted to embrace the student again and she said, 'No, I don't want to.' The student left about five minutes after the last incident and did not return to work, reporting to Financial Aides [*sic*], asking for another job, explaining what had transpired, and indicating that she had not come back sooner because she was confused.

"It should be noted that a prior need for improvement notice, dated October 20, 1977, is contained in the patient's personnel file and refers to 'over-familiarity with female student helpers.' The patient denied all allegations in the 1977 reprimand regarding over-familiarity with females students, noting that he had not been stand-offish and distant from students, saying they are people also.

"In contrast to the denial of the 1977 allegation, the patient admits to all essential details as noted in the student's charges, dated February 20, 1981, and referring to the above-noted incident, dated February 6, 1981. When asked to explain his obviously inappropriate behavior, the patient spoke of being upset, shocked and amazed, adding that he hadn't slept well and remains concerned over the loss of his job and 'deplorable behavior.'"

In pertinent part, the report also states: "It is my opinion that this patient can be rehabilitated without presenting a danger to himself or others. Specifically, the possibility of a recurrence of the above behavior appears to be very minimal given ongoing therapy and monitoring. . . .

"A critical focus in assuring appropriate control of behavior should be to concentrate in therapy on the patient making ongoing appropriate connections between the critical intervening variable between himself and his behavior, namely his feelings. . . . Specifically, the following treatment plan is recommended to assure that this patient will not reoffend:

"1. Individual psychotherapy, coupled with conjoint marital therapy on a once-weekly basis. (This will offer the therapist an opportunity to make significant interventions in the family constellation as well as obtain ongoing data.)

"2. With the permission of the patient and his wife, this therapist would be willing to monitor the patient's progress as well as report to the school psychologist on an as-needed basis."

When the board met on August 4, 1981, presumably it had before it all the exhibits including, with respondent's consent, the Dr. Levy letter of July 27. Respondent was represented by counsel at the board hearing and had full knowledge of all the evidence in the exhibits. We find nothing to show the use before the board of any prior derogatory statements and/or prior misconduct of which respondent did not have prior notice and knowledge.

There is nothing in *Miller, supra,* 24 Cal.3d 703 or in Education Code sections 87031, 44031 or 44664 which requires appellants to give a specific written notice detailing prior derogatory remarks or misconduct which may be used in aid of a specific charge and that what occurred in *Miller* with respect to a general charge of incompetence (wherein the omissions were actually a part of the intrinsic proof of the incompetence generally charged). At bench there was a specific charge proved beyond a reasonable doubt.

The Commission, however, although in our opinion it would have been justified to do so, did not use any of the prior misconduct or derogatory statements, and implicitly repudiated the same by its statement that prior derogatory conduct and/or statements ". . . was not properly before the Board . . . ." Its findings are incisive as is its disposition of the single charge before it.

"1. That respondent breached his trust and responsibility for the supervision of students.

"2. That respondent's conduct toward Ms. Suncar on February 6, 1981, constitutes failure of good conduct and is sufficient cause for dismissal."

■ The question remaining is the propriety of the judgment of dismissal imposed by the Commission. Concededly the specific charge made against respondent is true. It is admitted by the express terms of the superior court judgment which disapproves of the dismissal but recommends the consideration of a judgment less absolute and more favorable to respondent.

We do not agree the judgment of the Commission is excessive nor does the record in any logical or sound respect by substantial evidence and/or the weight of the evidence suggest the Commission abused its discretion when it imposed the judgment of dismissal.

If however one assumes the judgment appealed from is sound, such assumption *must rest wholly upon the opinion* expressed by the psychologist in his letter of July 27, 1981. When the letter is analyzed in the light of the admitted facts and those inherent in the judgment appealed from the inevitable conclusion which must be drawn is that College cannot without great moral and financial risk to College and the general public reinstate respondent *even temporarily.* In our opinion too, College has no pragmatic option to employ respondent in any capacity even if and when respondent is reported to be completely rehabilitated.

Thus *Ebersol* v. *Cowan* (1983) 35 Cal.3d 427, 434 [197 Cal.Rptr. 601, 673 P.2d 271], holds: ". . . if the agency [for third party action purposes] knew or should have known of the dangerous propensities Mark Cates exhibited in the instant case it might have had a duty to advise persons foreseeably coming in contact with the student." (See also *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166]; *Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 807, 809, 815 [205 Cal.Rptr. 842, 685 P.2d 1193].)

Analyzed in the light of the record the psychologist's opinion ventured in his July 27 letter is not sound and certainly is not one sufficient to set aside and nullify the decision of the Commission on the ground that the Commission abused its discretion in assessing a proper punishment.

We have explored the evidence in more than usual detail as it almost demonstrates an impeachment of the opinion of Dr. Levy. To illustrate: the record shows Dr. Levy rendered the *same opinion* to respondent on or some days prior to June 15 approximately six weeks before July 27, 1981. In pertinent part the letter in its opening paragraph says: "The patient was seen in my offices on July 17 and July 18, 1981, for a total of nine hours of interviews and psychological diagnostic testing . . . ."

On June 15, respondent transmitted to Dr. Moore, president of the College as his reason for withdrawing his request to retire the opinion of Dr. Levy expressed to him that he could be rehabilitated. In the written report and prognosis dated July 27, Dr. Levy fixes July 17 and 18 as the days on which he spent a total of nine hours with respondent. If there were any prior

treatments they are not mentioned in the letter of July 27. On the results accumulated in those July hours the doctor elects to base his prognosis to the effect respondent can be rehabilitated but only on condition that respondent continue treatment as is ordered by paragraph 2 of the superior court judgment set forth in the opening paragraphs of this opinion.

Further, the doctor's opinion shows respondent's rehabilitation is conditioned in an important respect by a continuance of respondent's marital relationship which has been subjected to serious strain in the past. Dr. Levy is optimistic that the marital situation too can be with psychological help satisfactorily adjusted.

Dr. Levy signs his letter of July 27 as a Ph.D. licensed clinical psychologist/forensic, and states in part: "Parenthetically, it should be noted that some problems reflecting difficulty in short-term memory appear to reflect a relatively long-term static condition dating back to a plane crash [respondent] suffered as a Marine pilot in World War II. While he has evidently compensated for this difficulty, further examination is recommended to rule out the 1 percent chance of an active rather than static lesion."

Parenthetically we note he is not an M.D. and clearly not a specialist on dormant lesions. We do not consider him qualified even on a "forensic" basis to express an opinion on a 1 percent possibility that the accident suffered by respondent as a Marine pilot in World War II resulted in "an active or other than a static lesion."

Thus if and when "a written report [has been rendered] that respondent has been rehabilitated" by ". . . Dr. Marshall Levy or other competent psychologist" respondent must be automatically and permanently reinstated.

Could a hearing be requested? Would the report of a psychiatrist or any other evidence be acceptable? Assuming that paragraph 2 of the judgment is valid, it is uncertain, inequitable to all the parties and it abdicates judicial authority.

The litigation before this court is not a child custody contest wherein judicial authority is on occasion in large part usurped by experts. At bench the judicial authority is totally usurped. The report admits respondent is not yet rehabilitated but pursuant to the opinion of a named psychologist or a reasonable facsimile that he will or may be reinstated if the conditions set forth in the letter of July 27 are fulfilled on some unspecified date in the future. Thus the judgment compels College to conditionally reinstate re-

spondent irrespective of the obvious legal and financial burdens which may ensue.

We hold, however, that the facts detailed with respect to the specific literal charge and all its inherent innuendoes were overwhelmingly proved, and that procedural requirements for the hearing before the board and/or Commission were complied with in all respects. The Commission and the courts have a grave responsibility not alone to respondent but also to the appellants and their personnel, the professors, instructors and students they embrace, and to the general public.

The judgment is reversed. Superior court is directed to vacate its judgment and enter a new and different judgment dismissing respondent's petition. Costs to appellant.

Compton, J., and Gates, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied January 17, 1985.